IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PATRICK TATE ADAMIAK,<br><br>Defendant. | Case No. 2:22-cr-00047<br><br>**DEFENDANT'S MOTION TO DISMISS AND MEMORANDUM IN SUPPORT** |

Defendant Patrick Tate Adamiak ("Defendant") respectfully moves this Court to dismiss Counts 1 – 5 of the Superseding Indictment (ECF 28) against him. In support of this Motion, Defendant hereby states:

### I.  LEGAL STANDARDS

#### a.  ULTIMATE FACTS TO SUSTAIN AN INDICTMENT

An indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "One of the principal purposes of an indictment is to apprise the accused of the charge or charges leveled against him so he can prepare his defense." *United States v. Fogel*, 901 F.2d 23, 25 (4th Cir. 1990). The Fourth Circuit U.S. Court of Appeals has stated that "[t]o pass constitutional muster, an indictment must (1) indicate the elements of the offense and fairly inform the defendant of the exact charges and (2) enable the defendant to plead double jeopardy in subsequent prosecutions for the same offense." *United States v. Williams*, 152 F.3d 294, 299 (4th Cir. 1998) (citing *United States v. Sutton*, 961 F.2d 476, 479 (4th Cir. 1992)).

**Prepared by David Michael Good, P.C**.

Prepared by David Michael Good, P.C.

While an indictment that tracks the language of the statute is sufficient "as long as the language sets forth the essential elements of the crime," an indictment must also "include enough facts and circumstances to inform the defendant of the specific offense being charged." *U.S. v. Yonn*, 702 F.2d 1341, 1348 (11th Cir. 1983); *U.S. v. Bobo*, 344 F.3d 1076, 1083 (11th Cir. 2003); *see also U.S. v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006).

Accordingly, while an indictment does not need to "allege in detail the factual proof that will be relied upon to support the charges," it must state sufficient ultimate facts on the face of the pleading for a court to conclude that a crime had been committed—the Government's mere conclusory recitation of the elements is insufficient. *U.S. v. Crippen*, 579 F.2d 340, 342 (5th Cir. 1978).

### i. DEFINITION OF A DESTRUCTIVE DEVICE: "PLUS FACTOR" AND INTENT ARE NEEDED

A sister circuit, in interpreting the definition of destructive device under 26 U.S.C.S. § 5845(f), stated that: "[a]lthough the statute does define a 'destructive device' to include explosive devices, such as [appellee's], it also explicitly excludes from coverage any explosive device not designed for use as a weapon. 26 U.S.C. § 5845(f). Thus, a device that explodes is not covered by the statute merely because it explodes. Statutory coverage depends upon proof that a device is an explosive plus proof that it was designed as a weapon. No explosive can constitute a destructive device within the meaning of the statute unless it has this 'plus' factor." *United States v. Hammond*, 371 F.3d 776, 780 (11th Cir. 2004) (holding that to qualify as a destructive device under the National Firearms Act, the Government must show a "plus" factor to show that it was *designed and intended* as a weapon.).

This is relevant because 26 U.S.C. § 5845(b) defines "machinegun," in relevant part, as "any combination of parts from which a machinegun can be assembled", with a "machinegun" being "any *weapon* which *shoots*, or can be readily restored to shoot, automatically more than one shot…by a single function of the trigger." (emphasis added).

Accordingly, for a set of parts to be a "machinegun" under 26 U.S.C. § 5845(b), they must be: (1) a weapon—which can be demonstrated by the "plus" factor as in *Hammond*, (2)—and must shoot automatically. Neither is properly alleged here.

### b. VAGUENESS AND LENITY: THE NFA TARGETS "CRIME WEAPONS," NOT DESTROYED RELICS

The vagueness doctrine requires that a criminal statute "clearly define the conduct it proscribes." *Skilling v. United States*, 561 U.S. 358, 415 (2010) (Scalia, J., concurring in part and concurring in the judgment); *accord Johnson v. United States*, 576 U.S. 591, 596 (2015) (Fifth Amendment guarantees that every criminal law provides "ordinary people fair notice of the conduct it punishes" and is not "so standardless that it invites arbitrary enforcement"). In *United States v. Lanier*, 520 U.S. 259 (1997), the Supreme Court described three aspects of the requirement that criminal statutes give "fair warning" of what is outlawed. First, "the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Id.* at 266. Second, any ambiguity in a criminal statute must be resolved in favor of applying the statute only to conduct which is clearly covered. *Id.* Third, although clarity may be applied by judicial gloss, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor

**Prepared by David Michael Good, P.C**.

any prior judicial decision has fairly disclosed to be within its scope." *Id.; see also United States v. Denmark*, 779 F.2d 1559 (11th Cir. 1986). Central to each inquiry is "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Lanier*, 520 U.S. at 267.

"A penal statute may be void for vagueness 'for either of two independent reasons.'" *City of Chicago v. Morales*, 527 U.S. 41, 56, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999). First, a statute may be unconstitutionally vague if it "fails to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits." *Id.* (citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). A statute may also be unconstitutionally vague if it "fails to provide explicit standards to prevent arbitrary and discriminatory enforcement by those enforcing the statute." *Lim*, 444 F.3d at 915 (citing *Karlin v. Foust*, 188 F.3d 446, 458-59 (7th Cir. 1999)). As observed by the United States Supreme Court, the requirement that a penal statute provide minimal guidelines to discourage arbitrary enforcement is "perhaps the most meaningful aspect of the vagueness doctrine." *Smith v. Goguen*, 415 U.S. 566, 574 (1974). Without these minimal enforcement guidelines, "policemen, prosecutors, and juries are allowed to pursue their personal predilections." *Kolender*, 461 U.S. at 358.

The Sixth Circuit has held that "after exhausting the traditional tools of statutory construction, § 5845(b) remains ambiguous. *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 898 (U.S. 6th Cir. 2021). If statutory language is ambiguous, then "the rules of statutory construction allow the Court to look beyond the plain language reading of the statute to its legislative history in order to further aid in its interpretation." *Id.* at 1010. "[T]he purpose of Firearms Act, of which § 5861 is a part, is to go after crime

**Prepared by David Michael Good, P.C**.

Prepared by David Michael Good, P.C.

weapons," not spare parts and destroyed relics. *See U.S. v. Vest*, 448 F. Supp. 2d 1002, 1014 (S.D. Ill. 2006).

"[A] law imposing criminal sanctions—whether it be a statute or a regulation—must provide fair notice of the prohibited conduct." *Gun Owners of Am., Inc.*, 19 F.4th at 901. The rule of lenity "is premised on two ideas: First, 'a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed'; second, 'legislatures and not courts should define criminal activity." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 n.18, 115 S. Ct. 2407, 2416 (1995). The government's conduct here falls short of both.

### c. CONGRESS HAS EXCEEDED ITS AUTHORITY UNDER THE TAX AND SPEND CLAUSE

"Congress cannot punish felonies generally." *Cohens v. State of Virginia*, 19 U.S. 264, 428 (1821). Accordingly, every criminal penalty it enacts "must have some relation to the execution of a power of Congress" (*Bond v. U.S.*, 572 U.S. 844, 844, 134 S. Ct. 2077, 2083 (2014)), like the "power to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States," so long as they are "uniform throughout the United States." U.S. Const., Art. I, § 8, cl. 1. A law which does not attach consequences "beyond requiring a payment to the IRS" is a penalty—not a tax. *Id.* at 567-68. Individuals who produce items like the machinegun have no option to pay a tax. *See United States Justice Manual 9-63.516*, "Charging Machinegun Offenses Under 18 U.S.C. § 922(o), Instead of Under the National Firearms Act," 1999 WL 33219894, at *1. (because it is impossible to comply with the registration and taxation provisions in the NFA, prosecutors should charge the

unlawful possession or transfer of a machine gun made after May 19, 1986 under § 922(o).

## II. THE GOVERNMENT FAILED TO STATE SUFFICIENT ULTIMATE FACTS TO ALLEGE A CRIME

### a. AS PLED, AND IN FACT, THE COMPLAINED OF ITEMS ARE NOT DESTRUCTIVE DEVICES OR MACHINEGUNS

Counts 1 and 2 of the indictment are entirely barren as to what makes the alleged PPSH a machinegun. It merely asserts the existence of a PPSH and its status as a machinegun. This allegation is insufficient as a matter of law.

Notably, the indictment did *nothing* to describe the alleged PPSH. This is because no machinegun exists. In a manner that colors the virtual entirety of the superseding indictment, compounding the vagueness problem, the government has made no allegations as to what renders the items at the core of this matter unlawful. The PPSH and other items in question were not machineguns or destructive devices, or even weapons, but rather destroyed, nonfunctional relics of the type commonly sold online and at enthusiast exhibitions. *See* Ex. A.

Second, the Government did not allege anything that can be construed as an adequate "plus" factor under case law interpreting as explained *supra*. In *Hammond*, "[t]he 'firearm' in question was a cardboard tube, approximately thirteen inches long and one-and-one half inches in diameter." The inside of the tube "was filled with…nine ounces of…an explosive powder[.]" "A green fuse, wrapped in aluminum foil, was placed through one of the ends and ran to the center of the device." *Id.* at 778. The court found that the explosive capabilities, and even the threat of serious injury was "not enough to bring the device within the statutory framework" because it did not have the

Prepared by David Michael Good, P.C.

"plus factor" to show that it was designed as a weapon. *Id.* at 780. Similarly, in this case the Superseding Indictment is facially defective because there is no "plus" factor alleged to sustain the legal conclusion that these destroyed, nonfunctional relics are designed and intended solely for use as a weapon, as required by the statute.

The Government may argue that *Hammond* is distinguishable from the PPSH at issue in this case because it involves a "destructive device" under § 5845(f) which specifically excludes "any device which is neither designed nor redesigned for use as a weapon" as opposed to a "machinegun" under § 5845. Defendant submits that the standard under § 5845(b) is actually more stringent than the destructive device definition because it includes the language "designed and intended solely and exclusively" as opposed to merely "designed". *See also Def. Distributed v. United States Dep't of State*, 838 F.3d 451, 454 (5th Cir. 2016) (discussing "an unfinished piece of metal that looks quite a bit like a lower receiver but is not legally considered one and may therefore be bought and sold freely" that "requires additional milling and other work to turn into a functional lower receiver"); John Markoff, *Data-Secrecy Export Case Dropped by U.S.*, The New York Times, Jan. 12, 1996, https://www.nytimes.com/1996/01/12/business/data-secrecy-export-case-dropped-by-us.html (The Government, which regarded cryptographic software as a munition under the Arms Export Control Act, dropped a criminal investigation of Zimmermann without an indictment, stemming from his releasing an encryption program as shareware.).

What case law has made clear in this otherwise ambiguous definition is that the law requires something much more than the barebones Government has alleged. Accordingly, the Superseding Indictment should be dismissed.

**Prepared by David Michael Good, P.C**.

UNITED STATES OF AMERICA V. PATRICK TATE ADAMIAK; 2:22-cr-00047; DEFENDANT'S MOTION TO DISMISS AND MEMORANDUM IN SUPPORT - 7

### III. VAGUENESS AND LENITY: THERE WAS NO FAIR WARNING THAT THE CONDUCT ALLEGED AGAINST MR. ADAMIAK IS A CRIME

The Government has charged Mr. Adamiak with violating 26 §§ U.S.C. 5841, 5845, 5871(d), and 5871, and 18 U.S.C § 922(o) in Counts 1 – 5 of the Superseding Indictment. And for reasons thoroughly stated *supra*, the Government has failed to state sufficient ultimate facts to sustain those allegations, much less support scienter, as would be required on all charged counts.

In no event would a reasonably intelligent person foresee that the conduct charged in this case—the mere possession of freely available, non-functional components—would be deemed criminal. *See Ex. A*. As applied against Mr. Adamiak, the charged statutes are unconstitutionally vague under the Fifth Amendment.

It is worth emphasizing that no court has ever applied the National Firearms Act to a fact pattern like this one with respect to the PPSH, and the government's charge for the remaining items is inconsistent with ATF's own prior rulemaking. Defendant here is a simple collector of surplus. The conduct at issue certainly isn't in the heartland of machinegun cases.

As the Sixth Circuit recently wrote, after exhausting the traditional tools of statutory construction, the charged statutes remain ambiguous. *See Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 898 (U.S. 6th Cir. 2021). However, the law's purported purpose "is to go after crime weapons," not mere militaria as is the case here. *See Vest*, 448 F. Supp. at 1014. The law is, at best, ambiguous in whether it applies to the conduct alleged against the charged conduct—simple possession of non-functioning, freely

**Prepared by David Michael Good, P.C**.

available hardware—and accordingly, the rule of lenity also requires it to be construed narrowly.

"The Attorney General has directed the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) to administer, enforce, and exercise the functions and powers of the Attorney General with respect to Chapter 44 of Title 18 and Chapter 53 of Title 26. 28 C.F.R. § 0.130(a)." *Gun Owners of Am., Inc.*, 19 F.4th at 897. "The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 843, 104 S. Ct. 2778, 2782 (1984). Unlike with widely publicized bump stocks, suppressors, and other items, ATF has issued no guidance relating to drawings. In fact, ATF recently rescinded *all* guidance in the context of what is and is not a "firearm" when it comes to incomplete or "partially finished" articles. *See Definition of "Frame or Receiver" and Identification of Firearms*, 87 F.R. 24652 at 24672 ("Any such classifications, to include weapon or frame or receiver parts kits, would need to be resubmitted for evaluation.").

Because "[a]pplying the statute to determine whether a device constitutes a machinegun [or destructive device] is within ATF's substantive field", the government may seek to invoke *Chevron*. However, *Chevron* does not displace the rule of lenity "simply because an agency has interpreted a statute carrying criminal penalties." *See id.* at 901. As the Supreme Court wrote in *Babbitt*:

> We have applied the rule of lenity in a case raising a narrow question concerning the application of a statute that contains criminal sanctions to a specific factual dispute . . . where no regulation was present.

Prepared by David Michael Good, P.C.

UNITED STATES OF AMERICA V. PATRICK TATE ADAMIAK; 2:22-cr-00047; DEFENDANT'S MOTION TO DISMISS AND MEMORANDUM IN SUPPORT - 9

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 n.18 (1995).

Where there is ambiguity in a criminal statute—or regulation interpreting that statute, doubts are resolved in favor of the defendant. *See Yates v. United States*, 574 U.S. 528 (2015); *Skilling v. United States*, 561 U.S. 358 (2010); *United States v. Santos*, 553 U.S. 507 (2008); *Jones v. United States*, 529 U.S. 848 (2000); *United States v. Izurieta*, 710 F.3d 1176 (11th Cir. 2013); *United States v. Trout*, 68 F.3d 1276 (11th Cir. 1995). Here, similarly, the only administrative rulemakings and applicable caselaw point towards Mr. Adamiak's conduct being lawful.

The government has not alleged that any of the items were functional, assembled, or even complete. This is because none of them were. It is hard to glean strategy from a blank canvas, but assuming, *arguendo*, that the government may claim there was some manner or way of assembling separate parts into an unlawful configuration. The fact that there may be a way to assemble lawfully owned parts into an illegal firearm or destructive device does not render the parts unlawful, as explored thoroughly in *United States v. Thompson-Center Arms Company*. 504 U.S. 505 (1992) (a kit including a 10-inch-barreled pistol, a 16-inch barrel, and a buttstock was not a "short barreled rifle"). The *Thompson-Center* Court opined that components from which an NFA firearm could be made could only be considered an NFA firearm if they were kept in such a manner that the only useful purpose therefore would be to create an NFA firearm. This case does not smack of such, and as such, this honorable Court should invoke the rule of lenity, as the Court did in *Thompson-Center*.

**Prepared by David Michael Good, P.C**.

UNITED STATES OF AMERICA V. PATRICK TATE ADAMIAK; 2:22-cr-00047; DEFENDANT'S MOTION TO DISMISS AND MEMORANDUM IN SUPPORT - 10

ATF itself is aware of this and has issued a rulemaking clarifying that the simple possession of parts from which an NFA firearm might *possibly* be constructed is not the same as possession of an NFA firearm. ATF Rul. 2011-4.

The Supreme Court in *Yates* explained that if the statute "leaves any doubt" about the application of the statute to the facts to which the government seeks to have the statute apply, the rule of lenity precludes such application. *I.e.*, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Yates*, 574 U.S. at 547-48 (quoting *Cleveland v. United States*, 531 U. S. 12, 25 (2000) and *Rewis v. United States*, 401 U. S. 808, 812 (1971)); *see Liparota v. United States*, 471 U. S. 419, 427 (1985) ("Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability."). In determining the meaning of "machinegun" under the National Firearms Act, "it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *Yates*, 574 U.S. at 548, (quoting *Cleveland*, 531 U.S. at 25, and *United States v. Universal C. I. T. Credit Corp.*, 344 U. S. 218, 222 (1952)); *see also Jones v. United States*, 529 U. S. 848, 858–859 (2000). *Santos* explained that the rule of lenity "not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed. It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead." *Santos*, 553 U.S. at 514.

Prepared by David Michael Good, P.C.

### IV. THE GOVERNMENT'S CONDUCT IS VIOLATIVE OF THE SECOND AMENDMENT

#### a. THE *BRUEN* DECISION AND ITS LEGAL STANDARD

*Bruen* held as unconstitutional New York's 1911 Sullivan Act, requiring a license and demonstration of "proper cause" for the possession and carrying of a concealable firearm. *Bruen*, 597 U.S. __ at *2. What makes *Bruen* particularly germane to the instant matter is its announcement of a clear legal standard for the evaluation of acts regulating the peaceable keeping and bearing of arms. *Bruen* identified the Court of Appeals' "coalesce[ing] around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-ends scrutiny", the Court correctly identified this as "one step too many[.]" *Id*. *9-10. Those previous decisions at the various Courts of Appeal manifested deference to the Government in a manner unlike that seen in the context of any other fundamental right and identified as improper the hand-waving of laws clearly targeted at bearing arms as without the scope of the Second Amendment. *Id*. *14 (reading case law to "necessarily reject[]" intermediate scrutiny in the Second Amendment context, further positing that a "constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all.") (quoting *Heller v. District of Colombia*, 554 U.S. 570 at 634 (2008)).

The Court has now articulated a standard which clearly defines the burdens in a case involving restrictions on the right to keep and bear arms. It is, as artfully penned by the Court, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The Government must *then* justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearms regulation. Only then may a court conclude that the individual's conduct

falls outside the Second Amendment's 'unqualified command.'" (cleaned up) (emphasis added).

To summarize: any law, regulation, or government policy affecting the "right of the people to keep and bear arms," U.S. CONST., Amend. II, can only be constitutional if the Government demonstrates analogous restrictions deeply rooted in American history evinced by historical materials contemporaneous with the adoption of the Bill of Rights in 1791. *Bruen*, 597 U.S. at *29.

### b. THE STATUTES HERE AT ISSUE AFFECT CONDUCT COVERED BY THE SECOND AMENDMENT'S "UNQUALIFIED COMMAND"

Defendant is charged under 18 U.S.C. 5841, 5845, 5861 and 5871, and 18 U.S.C. § 922(o), as well criminal forfeiture related to those alleged offenses. The charged statutes deal with the taxation and transfer of destructive devices, machineguns, and other arms. The Government alleges the components at issue—without explanation—to be machineguns and destructive devices. What's more, the passage of §922(o), subsequent to the passage of the other charged statutes, render it impossible to comply with the taxing provisions in the machinegun context, thus leaving the statutes a bizarre, vestigial area of law passed pursuant to the taxing power which—in dubious constitutionality—is used by the Government as an independent effective prohibition on the sale, transfer, or possession of machineguns not registered by 1986.

The Government may attempt to argue that machineguns and destructive devices are beyond the scope of the Second Amendment by attempting to characterize them as "dangerous and unusual," as it has in other cases, but this is not the test. The court's invocation of "dangerous and unusual" weapons in *Heller* and subsequently thoroughly

Prepared by David Michael Good, P.C.

Prepared by David Michael Good, P.C.

discussed in *Bruen* was in discussion of the 1328 Statute of Northampton and its progeny, which regulated the *carrying* of "dangerous and unusual" arms *in such a manner as would necessarily cause terror*. As the *Bruen* Court correctly observed, this historical legislation passed by the parliament of England was not analogous to a law restricting the carrying of arms generally, and thus is not logically analogous to the statutes at issue, which impose severe criminal penalties on the mere peaceable possession of arms. *Bruen*, 597 U.S. at *12 (Clarifying that the Court was not undertaking "an exhaustive historical analysis…of the full scope of the Second Amendment") (quoting *Heller*, 554 U.S. at 627).

    The only way a court may conclude a defendant's conduct falls outside the scope of the Second Amendment's unqualified command remains clear: the Government must prove the particular regime in question is consistent with the history and tradition of the United States. *Id* at *15. Furthermore, the question of whether a weapon is "in common use at the time," necessarily pins the analysis to the time *before the prohibition*. To consider otherwise would incentivize the Government to legislate wantonly and aggressively, seizing arms, then later evade constitutional scrutiny by suggesting that the arms cannot be in common use, because the government prohibited them. Such circular logic would be inconsistent with any fundamental rights jurisprudence. Thus, the Government must prove whether the arms at issue were available for lawful use before 1934, plus whether the regime in question is consistent with the history and tradition of firearms regulation in this country around the founding era.

### c. THE LAWS HERE AT ISSUE ARE FACIALLY UNCONSTITUTIONAL UNDER *BRUEN*

No federal regulation of firearms existed before the 1934 enactment of the main laws here at issue. In addition to the previously raised Constitutional questions, nothing in the applicable history and tradition of the United States supports the categorical ban of arms, much less nonfunctional items the Government might, with their own resources and labor, transform into weapons. Further, the ATF's decision that the non-functional collectibles here at issue were regulable came completely by administrative fiat, absent even notice and comment. Our Nation's history and tradition does not, and cannot, support a finding that non-functional, freely sold merchandise can carry life-ruining criminal penalties depending only on the opinion of an unelected bureaucrat. To hold otherwise would be to grant the Bureau more power than Congress could have ever lawfully granted it and render innumerable items potentially illegal. *See Bruen*, 597 U.S. at *19-20 ("Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearms regulation requires a determination of whether the two regulations are "relatively similar." . . . "Even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.") (cleaned up) (internal citations removed).

As *Bruen* explained, historical analogues to a regulation can be helpful, but Defendant here proffers more modern evidence that a categorical ban on arms, as the Government here seeks to enforce against trinkets, would be unconstitutional. We present the testimony of then-Attorney General Cummings at a 1934 hearing on the National Firearms Act.

**Prepared by David Michael Good, P.C**.

UNITED STATES OF AMERICA V. PATRICK TATE ADAMIAK; 2:22-cr-00047; DEFENDANT'S MOTION TO DISMISS AND MEMORANDUM IN SUPPORT - 15

> MR. LEWIS: I hope the courts will find no doubt on a subject like this, General; but I was curious to know how we escaped that provision in the Constitution.
>
> ATTORNEY GENERAL CUMMINGS: Oh, we do not attempt to escape it. We are dealing with another power, namely, the power of taxation, and of regulation under the interstate commerce clause. <u>You see, if we made a statute absolutely forbidding any human being to have a machine gun, you might say there is some constitutional question involved.</u> *But* when you say "We will tax the machine gun" and when you say that "the absence of a license showing payment of the tax has been made indicates that a crime has been perpetrated", you are easily within the law.
>
> MR. LEWIS: In other words, it does not amount to prohibition, but allows of regulation.
>
> ATTORNEY GENERAL CUMMINGS: <u>That is the idea</u>. We have studied that very carefully.

National Firearms Act: Hearings before the Committee on Ways and Means, House of Representatives on H.R. 9066, 73 Cong. 2d Sess. (1934). Defendant posits that the then-Attorney General, advancing the very law whose constitutionality was even then dubious, admitting that a categorical ban on machineguns would present constitutional problems, is instructive that there is no historical basis for the current regime—essentially reflecting what Mr. Cummings describes as problematic—consistent with the Second Amendment. Defendant further posits that the later-enacted 922(o) completes the logical circuit Mr. Cummings described in 1934.

**Prepared by David Michael Good, P.C**.

### d. THE LAWS HERE AT ISSUE ARE UNCONSTITUTIONAL AS APPLIED TO DEFENDANT UNDER *BRUEN*

In the alternative to that advanced above, the application of the charged offenses are unconstitutional as it applies to Defendant. Even if the Government could somehow prove to the Court that the wholesale felonization of the peaceable possession of an entire category of arms to be consistent with the Constitution, this case presents something far more peculiar: an administrative agency's unilateral decision that nonfunctional items—as the exhibits show are freely traded—might subject its owner to lengthy prison terms. There can be no historical justification, consistent with the "unqualified command" of the Second Amendment, plus the clear metes of the First, that could justify such a prosecution. Should any exist, the Government bears the burden to prove it. *Bruen* at *15 ("Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"); *id.* at *20 ("whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry.) (cleaned up) (quoting *McDonald v. Chicago*, 561 U.S. 742 at 767 (2010)).

### V. CONCLUSION

For all the reasons argued *supra*, the Superseding Indictment should be dismissed against Mr. Adamiak. It is defective for failing to state sufficient ultimate facts, there is no "plus factor" alleged necessary to make a finding that the alleged items violate the NFA or GCA, this prosecution runs afoul of the rule of lenity, and the government is without the power to regulate as it has. Accordingly, the Government has failed to allege that Mr. Adamiak committed a crime, much less that he has committed

**Prepared by David Michael Good, P.C**.

one with scienter. The Court should err on the side of lenity and Mr. Adamiak. He should not be forced to endure a criminal trial (and possible appeals) just so that the government can test novel applications of the National Firearms Act.

If the Court dismisses this case, the Government can appeal, and if the Fourth Circuit holds that the National Firearms Act and Gun Control Act can constitutionally be applied to the facts alleged in this case, then the prosecution can proceed. The Government will not have suffered any harm. The opposite is not at all true for Mr. Adamiak. Using Mr. Adamiak as a guinea pig will needlessly and irreparably harm his reputation, financially ruin him, and necessarily divert his attention and time to defending himself against these dubious charges.

Wherefore, Defendant Patrick Tate Adamiak respectfully moves this Honorable Court to dismiss the Superseding Indictment against him in its entity with prejudice, and for any further relief that this Court deems just and proper.

Respectfully submitted,

PATRICK TATE ADAMIAK
Of Counsel

/s/
David Michael Good
Virginia State Bar No. 44107
Attorney for Patrick Tate Adamiak
David Michael Good, P.C.
780 Lynnhaven Parkway, Suite 400
Virginia Beach, Virginia 23452
Telephone: (757) 306-1331
Facsimile: (888) 306-2608
E-mail: dgood@dgoodlaw.com

Lawrence H. Woodward
Virginia State Bar No. 21756
Attorney for Patrick Tate Adamiak
Ruloff, Swain, Haddad, Morecock, Talbert & Woodward, P.C.

**Prepared by David Michael Good, P.C.**

UNITED STATES OF AMERICA V. PATRICK TATE ADAMIAK; 2:22-cr-00047; DEFENDANT'S MOTION TO DISMISS AND MEMORANDUM IN SUPPORT - 18

317 30th Street
Virginia Beach, VA 23451
Telephone: (757) 671-6000
Facsimile Number: (757) 671-6004
E-mail: lwoodward@srgslaw.com

CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of August 2022, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record, including the following:

William David Muhr, Esq.
Assistant United States Attorney
Attorney for Government
United States Attorney's Office
101 W Main Street, Suite 8000
Norfolk, VA 23510-1671
Phone: (757) 441-6331
Email: Bill.Muhr@usdoj.gov

Victoria Liu, Esq.
Special Assistant United States Attorney
Attorney for Government
United States Attorney's Office
101 W Main Street, Suite 8000
Norfolk, VA 23510-1671
Phone: (757) 441-6331
Email: victoria.liu@usdoj.gov

/s/
David Michael Good
Virginia State Bar No. 44107
Attorney for Patrick Tate Adamiak
David Michael Good, P.C.
780 Lynnhaven Parkway, Suite 400
Virginia Beach, Virginia 23452
Telephone: (757) 306-1331
Facsimile: (888) 306-2608
E-mail: dgood@dgoodlaw.com

**Prepared by David Michael Good, P.C.**

UNITED STATES OF AMERICA V. PATRICK TATE ADAMIAK; 2:22-cr-00047; DEFENDANT'S MOTION TO DISMISS AND MEMORANDUM IN SUPPORT - 19